IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ERIC STRONG,
        Plaintiff,

vs.                             Case No. 3:08cv402/MCR/MD

BREVARD ACHIEVEMENT CENTER, INC.,
        Defendant.
_____

**ORDER and
REPORT AND RECOMMENDATION**

      This case filed pursuant to the Americans with Disabilities Act of 1990 ("ADA"),[1] is before the court upon defendant's motion for summary judgment filed on November 16, 2009. (Doc. 54). Defendant also filed a supporting statement of facts and summary judgment materials. (Docs. 55, 56). On November 18, 2009 the court entered an order informing the parties that the motion for summary judgment would be taken under advisement on December 18, 2009. (Doc. 57). The order further advised the parties of the importance and ramifications of Rule 56 summary judgment consideration, and directed the parties to file and serve, prior to the advisement date, affidavits and any other documents or materials authorized to be filed under Federal Rule of Civil Procedure 56 and Northern District of Florida Local Rule 56.1(A). (*Id.*). In response, plaintiff filed a pleading entitled "Motion for Summary" (doc. 62), which presents additional argument and a limited number of

_____

[1]All of the conduct alleged in the complaint occurred prior to the effective date of the ADA Amendments Act of 2008 ("ADAAA"), Pub.L. No. 110-325, 122 Stat. 3553 (2008), which became effective on January 1, 2009. The plaintiff has not asserted that the Act should be applied retroactively, and the court therefore does not address the possible retroactivity of the ADAAA.

facts.  Because the document is neither sworn nor verified and is not accompanied by supporting Rule 56 materials, the court will not consider, as part of the summary judgment record, any new facts stated therein.  Upon review of the evidence in the summary judgment record, it is the opinion of the undersigned that defendant's motion for summary judgment should be granted.

## BACKGROUND AND PROCEDURAL  HISTORY

The defendant, Brevard Achievement Center, Inc. ("Brevard"), is an organization which helps adults with severe disabilities become independent members of the community by providing them with training, education and rehabilitative services.  (Doc. 56, Attach. 1, Stephens Aff. ¶ 1).  As one of its vocational programs, Brevard provides work and rehabilitation opportunities for disabled persons at various job sites where Brevard has obtained federal contracts under the Javits-Wagner-O'Day Act ("JWOD Act"), 41 U.S.C. §§ 46-48c.  The JWOD Act provides a means for organizations to compete for and obtain federal contracts, but only if at least 75% of the "man hours of direct labor" on the contract are performed by individuals with severe disabilities.  41 U.S.C. § 48b; *see also* Doc. 56, Attach. 1, Stephens Aff. ¶ 1.  Such workers are sometimes referred to as "sheltered" workers.  (Doc. 56, Attach. 1, Stephens Aff. ¶ 2, and Attach. 2, Strong Dep., p. 6).  Brevard maintains a JWOD contract for the provision of shelf stocking, warehouse, and custodial services at the Corry Station commissary in Pensacola, Florida.  (*Id*.).

The plaintiff, Eric Strong, is a client of Brevard who works as a shelf stocker at the Corry Station commissary.  (Doc. 1, pp. 3, 5; Doc. 56, Attach. 1, Stephens Aff. ¶ 1 and Attach. 2, Strong Dep., p. 6).  Mr. Strong was accepted into Brevard's program based upon the understanding that he qualified as a person with a disability under the JWOD Act.  Mr. Strong has a slow learning disabiltiy.  (Doc. 56, Attach. 2, Strong Dep. p. 8).

Mr. Strong initiated this action on September 12, 2008, by filing a complaint

claiming disability discrimination and retaliation under the ADA. 42 U.S.C. §§ 12101-12213. (Doc. 1). Specifically, Mr. Strong asserts that Brevard discriminated against him in the following ways: (1) giving him a copy of a hand drawn "clock," (2) changing the timekeeping method for sheltered employees from an automated system (timecard machine) to a manual system whereby employees' hours are recorded manually by a supervisor, (3) inquiring into the nature of Mr. Strong's disability, (4) calling him "retarded" and "stupid," (5) denying him training opportunities (opportunities to learn the "spotting" [2] and warehouse positions), and (6) denying him opportunities to make more money performing warehouse work, working the day shift, and stripping floors. (Doc. 1, pp. 4-5). Mr. Strong also alleges that after he reported one or more of the foregoing incidents of discrimination, Brevard retaliated against him by failing to include all of his hours on his paycheck and by delaying payment. (*Id.*, p. 5). Mr. Strong's complaint does not demand any relief. (*Id.*, p. 6).

Brevard has submitted a motion for summary judgment, a statement of facts and various summary judgment materials. (Docs. 54-56). According to Brevard, these documents establish that there are no genuine issues of material fact to be tried and further establish that Mr. Strong cannot prove he was subjected to discrimination, a hostile work environment, or retaliation. (Doc. 54).

In response, Mr. Strong has presented additional argument (doc. 62), but no Rule 56 materials (other than his verified complaint which is construed as an opposing affidavit).

## LEGAL STANDARDS

### Summary Judgment Standard

In order to prevail on its motion for summary judgment, Brevard must show

---

[2]To "spot" is to take merchandise from the pallet and lay it on the floor for the shelf stocker. (Doc. 1, p. 4; Doc. 56, Attach. 2, Strong Dep., p. 21).

that Mr. Strong has no evidence to support his case or present affirmative evidence that Mr. Strong will be unable to prove his case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If Brevard successfully negates an essential element of Mr. Strong's case, the burden shifts to Mr. Strong to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. Mr. Strong must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp.*, 477 U. S. at 324 (quoting FED.R.CIV.P. 56(e)). Mr. Strong must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Celotex Corp., supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997)("Rule 56(e) . . . requires the nonmoving party to go beyond the pleading and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c), (e))); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Mr. Strong in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90

S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Mr. Strong still bears the burden of coming forward with sufficient evidence of every element that he must prove. *Celotex Corp.*, 477 U.S. 317 (1986). A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

<u>Legal Standard for Disability Discrimination Claims</u>

The ADA makes it unlawful for a covered entity to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009). "In order to establish a *prima facie* case of discrimination under the ADA, [a plaintiff] must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) (citation omitted). Under the controlling law in this Circuit,

As to the third element, the plaintiff must prove discrimination by presenting either direct or circumstantial evidence of discriminatory animus. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 2746-47, 125 L.Ed.2d 407 (1993). "Direct evidence . . . is evidence that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'" *Schoenfeld v. Babbit*, 168 F.3d 1257, 1266 (11th Cir. 1999); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (stating that evidence which only suggests discrimination or is subject to more than one interpretation is not direct evidence.). Direct evidence consists of "only the most blatant remarks, whose intent could be nothing other than to discriminate." *See Schoenfeld*, 168 F.3d at 1266.

In the absence of direct evidence of discrimination, the plaintiff may present circumstantial evidence and invoke the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam) ("The burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims."). *See St. Mary's Honor Ctr.*, 509 U.S. at 506-07, 113 S.Ct. at 2746-47. Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If a plaintiff establishes this *prima facie* case, a presumption of discrimination is created, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.*, 509 U.S., at 506-07, 113 S.Ct., at 2746-47. "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,'" reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.*, 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, and n. 8, 101 S.Ct. 1089, 1094-95, and n. 8, 67 L.Ed.2d 207 (1981)).[3]

If the defendant satisfies this burden, the presumption disappears and plaintiff must prove that the proffered reasons were not the true reasons for the employment decision. *St. Mary's*, 509 U.S. at 507-08, 113 S.Ct. at 2747-48. *See also Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). A plaintiff can avoid summary judgment if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer, and (2) creates a reasonable inference that race was a determinative factor in the actions of which plaintiff complains. *See Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 370 (5th Cir. 1997).

---

[3]The burden on defendant to proffer a non-discriminatory reason for its action is a burden of production, and is satisfied regardless of the persuasive effect of the proffered reason. *See St. Mary's*, 509 U.S., at 506-07, 113 S.Ct. 2742.

Despite the burden-shifting framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S., at 253, 101 S.Ct., at 1093. He must establish a *prima facie* case and rebut any legitimate non-discriminatory explanation proffered by the employer. *St. Mary's*, 509 U.S., at 507, 113 S.Ct., at 2747.

## Legal Standard for Harassment/Hostile Work Environment Claims

As stated above, the ADA prohibits discrimination in the "[t]erms, conditions or privileges of employment." 42 U.S.C. § 12112(a). In construing identical language in Title VII, the Supreme Court has recognized the cognizability of a hostile work environment claim under that statute. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Neither the Supreme Court nor the Eleventh Circuit has explicitly recognized a cause of action under the ADA for disability harassment. *See Woodruff v. School Bd. of Seminole County, Fla.*, 304 Fed. Appx. 795, 799 (11th Cir. Dec. 19, 2008) (assuming, without deciding, that a harassment claim is cognizable under the ADA); *Fikes v. Wal-Mart, Inc.*, 322 Fed. Appx. 882, 884 n. 4 (11th Cir. Apr. 10, 2009) (declining to express an opinion on whether a hostile work environment claim is cognizable under the ADA).

Assuming *arguendo* that such a claim is cognizable, a plaintiff would have to prove that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forkliff Sys.*, 510 U.S. at 21, 114 S.Ct. at 370). In order to establish a *prima facie* case of hostile work environment, a plaintiff must prove:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working

environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller*, 277 F.3d at 1275.

The behavior "must be both objectively hostile or abusive as judged by a reasonable person, and subjectively abusive to the actual victim." *Woodruff* at 799 (citing *Harris* at 21-22, 114 S.Ct. at 370). Relevant to this determination is "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris* at 23, 114 S.Ct. at 371.

Legal Standard for Retaliation Claims

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge . . . under this chapter." 42 U.S.C. § 12203(a). This anti-retaliation provision is similar to Title VII's prohibition on retaliation. *See Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). Accordingly, in this Circuit retaliation claims asserted under the ADA are assessed under the same framework used for Title VII retaliation claims. *See id.* "To establish a *prima facie* case of retaliation, a plaintiff must show that he engaged in statutorily protected conduct, he suffered adverse action, and there is a causal connection between the protected conduct and the adverse action." *Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1314 (11th Cir. 2001) (citation omitted).

The Supreme Court has interpreted the second prong as requiring a plaintiff to show that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (quotations and citations omitted) (announcing "materially adverse" element for Title VII claims). Under *Burlington*, "the type of employer conduct considered

actionable has been broadened from that which adversely [a]ffects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008).

To establish the third prong, a causal connection, "a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (quotations and alterations omitted).

A plaintiff can establish a retaliation claim through either direct or circumstantial evidence. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The *McDonnell Douglas* burden-shifting analysis applies to cases involving circumstantial evidence. The plaintiff must first show that he established a *prima facie* case of retaliation. The employer then puts forth a legitimate, non-retaliatory reason for its decision. The burden then shifts back to the plaintiff to show that the reason given was a pretext for retaliation. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

## ANALYSIS

### Facts[4]

Mr. Strong began working for Brevard as a shelf stocker at the Corry Station

---

[4]The facts recited herein are drawn from Mr. Strong's complaint and evidence in the summary judgment record that is either undisputed or, if disputed, viewed in the light most favorable to Mr. Strong, the non-moving party. *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d1262, 1265 (11th Cir. 2005). Although Mr. Strong has not submitted a separate affidavit in response to the motion for summary judgment, his complaint was signed and declared as true under penalty of perjury. Therefore, the allegations in the complaint may be used as an opposing affidavit. *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *see also* 28 U.S.C. § 1746 (setting forth requirements for unsworn declarations under penalty of perjury). To function as an opposing affidavit, a complaint must be based on personal knowledge and set forth specific facts admissible in evidence. Fed.R.Civ.P. 56(e); *Perry, supra*; *Pace v. Capobianco*, 283 F .3d 1275, 1278 (11th Cir. 2002) (citing Fed.R.Civ.P. 56(e)). Accordingly, the court will consider those portions of Mr. Strong's complaint meeting such requirements as part of his opposition to Brevard's motion for summary judgment

commissary on September 7, 2006. (Doc. 1, p. 3; Doc. 56, Attach. 1, Stephens Aff. ¶ 1 and Attach. 2, Strong Dep., p. 6). He has three supervisors: Mr. Lyles, Ms. Roach and Mr. Lewis. (Doc. 56, Attach. 2, Strong Dep., p. 7). The allegations of his complaint are as follows:

> Mr. Charles Lyles gave Eric [Mr. Strong] opportunity to spot while Mrs. Roach was on leave. Spot is to lay the pallets out for the stocker. Mrs. Roach stated Eric could no longer spot. He asked, Why? Mrs. Roach stated because of his production was down. Then Mrs. Roach said that the home office wanted to know Eric disability. Patti Seaman at the home office sent word through Mrs. Roach again for Eric disability. Eric went to the Social Security Office to get proof. The Social Security Office said that he do not have to provide his disability to an employer, but they gave him a code on a letter of his disability. Once Patti Seaman received the letter, Mrs. Roach started calling Eric retarded to the other workers. Mrs. Roach said to Cleveland Swift in front of Eric. Mrs. Roach had a lead worker Mr. Lewis to give me a copy of a clock. She gave me the clock in 2006. Now that he file charges, the clock come up again but this time they gave one to everyone. Everyone use to clock in with time clock, now the people with disability are not allow to use the time clock. Whatever the supervisor write down is their time. This have been going on for about six months. Mr. Rutledge of the janitorial crew had Eric stripping the floors. The floors are stripped about twice a year. This is extra money during this time. Mrs. Roach stated that she was going to make sure Eric will not make any of this money. Mr. Rutledge told Eric to ask Mr. Charles Lyles and Mr. Lyles stated that he was not going to make Mr. [sic] Roach mad. Part of the retaliation the company started mess up Eric check for about a month and a half straight. They would not have his hours on his check and he would have to wait two weeks to get his pay. They owed Eric $54.00 on his check he never received it. Mrs. Roach had the employees calling Eric a retarded snitch.

(Doc. 1, pp. 4-5) (spelling, grammatical and punctuation errors in original).

In his deposition, Mr. Strong clarified his claims and the facts supporting them as follows. In 2006 when Mr. Strong first began working with Brevard, Mr. Lyles allowed him to "spot" while Ms. Roach was on a leave of absence. (Doc. 56, Attach. 2, Strong Dep., pp. 23-24). The day Ms. Roach returned from her leave she advised Mr. Strong he would no longer be allowed to spot on a regular basis during the

week, because his production was down.  Ms. Roach did, however, allow Mr. Strong to continue to spot for another two weeks.  (*Id*., pp. 24, 32-33).  Around that same time, Ms. Roach asked Mr. Strong what his disability was and advised him that Ms. Seaman of the "home office" needed documentation of his disability.  (Doc. 1, p. 9; Doc. 56, Attach. 2, Strong Dep., pp. 32-34).  In response, plaintiff told Ms. Roach he had a slow learning disability, and forwarded to Ms. Seaman a letter he obtained from the Social Security Administration identifying his disability by code.  Thereafter, on several occasions while Mr. Strong was spotting during the two-week period, Ms. Roach called Mr. Strong "retarded" and "stupid" in a co-worker's (Mr. Swift) presence.  (Doc. 56, Attach. 2, Strong Dep. pp. 32-35, 47-49, 130).  The name-calling occurred at times when Mr. Strong was putting things in the wrong place.  (*Id*., pp. 33-34, 47-49, 130).  Mr. Strong felt harassed by Ms. Roach's inquiry into his disability and name-calling.  (Doc. 1, pp. 4-5; Doc. 56, Attach. 2, Strong Dep., p. 10).

Co-worker Cleveland Swift also called Mr. Strong "stupid" and "retarded" during the time the two spotted together.  Several incidents occurred when Mr. Strong did something wrong.  (*Id*., pp. 35, 37, 38-40, 44, 48).  Several others occurred when Mr. Strong was on break and Mr. Swift was clocking out to leave for the day.  (*Id*., pp. 42-45).  Mr. Swift would look at Mr. Strong, tell him he was "stupid" or "retarded," and walk away.  (*Id*.).  Plaintiff was disturbed by this name-calling, and went home from work feeling "bad and upset."  (*Id*., p. 35).  Mr. Strong believes Mr. Swift harassed him in this way to upset him and make him quit because he was not friends with Mr. Swift.  Mr. Swift did not want to work with anyone who was not his friend.  (*Id*., pp. 39, 43-44).

On one or two occasions Ms. Roach and Mr. Swift also called Mr. Strong a "retarded snitch."  This occurred as a result of two incidents:  Mr. Strong reporting to management that Ms. Roach clocked in Mr. Swift when he wasn't there, and Mr. Strong falsely reporting to the military police that Mr. Swift had a gun on base.  (*Id*., p. 64).

On one occasion in 2008, Mr. Strong's supervisor Mr. Lyles used the term

"stupid" when discussing with Mr. Strong his false report to the military police that Mr. Swift had a gun. (*Id.*, pp. 35-36, 67, 74-75). After Mr. Lyles confronted Mr. Strong and inquired why he hadn't first informed Mr. Lyles of his suspicion, Mr. Strong responded that he was afraid Mr. Lyles would tip Mr. Swift off and allow him to avoid detection. In response, Mr. Lyles stated Mr. Strong "must be stupid" to think he would do that. (*Id.*, p. 36, 74-75). Mr. Lyles later apologized for the remark. (*Id.*, p. 75).

With regard to denial of opportunities, Mr. Strong asserts he is being denied opportunities to earn extra money stripping floors, working the day shift and performing warehouse work. Normally, members of the custodial crew strip the floors. On one occasion Mr. Rutledge, the supervisor of the custodial crew, allowed Mr. Strong to strip the floors. After Mr. Rutledge extended a second invitation to Mr. Strong and Strong sought Ms. Roach's approval, she denied the request stating she was not going to give Mr. Strong any more opportunities to do anything other than shelf-stocking. (*Id.*, pp. 57-58). The only employees who have been permitted to strip the floors are Mr. Strong (once), members of the custodial crew, and a supervisor in the shelf stocking area (James Harris) who is also a sheltered worker. (*Id.*, pp. 59-62, 66).

Other sheltered workers have been given warehousing and day shift positions, but Mr. Strong has not. (*Id.*, p. 77-80, 140). A sheltered worker desiring to move into a warehousing position must be trained. (*Id.*, p. 140). Ms. Roach provides the forklift training, and the warehouse employees provide remaining on-the-job training. (*Id.*). When Mr. Strong asked Ms. Roach if he could work in the warehouse, she said "no," explaining she did not want to take the time to train him. (*Id.*, pp. 81-82). Ms. Roach also denied, without reason, Mr. Strong's request to work on the day shift. (*Id.*).

In 2006 Mr. Lewis, at the direction of Ms. Roach, gave Mr. Strong a drawing of a "clock." (*Id.*, p. 49). Mr. Strong did not know why he was given the clock. (*Id.*). This offended him only because none of the other employees (including sheltered

workers) were given the drawing. (*Id.*, pp. 49, 51-52). After Mr. Strong wrote a letter to Mr. Lyles complaining about it, everyone was given the drawing. (*Id.*). Mr. Strong believes Ms. Roach drew the clock and gave it to him for the purpose of harassing him. (*Id.*, p. 52). Mr. Strong never asked Ms. Roach why he was given the drawing or what it meant. (*Id.*, p. 56).

At some point the sheltered workers were told they would no longer be using the timecard machine. (*Id.*, p. 117-18). Non-sheltered workers were allowed to continue to use the timecard machine. When Mr. Strong asked Ms. Roach why the timekeeping system had changed for sheltered workers, she responded that they had been "stealing time" by clocking in when they were not at work. (*Id.*, p. 118). Mr. Strong felt this was unfair because it was non-sheltered workers (Ms. Roach) who had been abusing use of the timecard machine. (*Id.*).

At one point during a period of 1½ months, one of the "leads" did not document Mr. Strong's hours correctly, resulting in his paycheck being $54.00 short. When Mr. Strong brought the shortfall to Ms. Roach's and Mr. Lyles' attention, they corrected it. (*Id.*, pp. 62-64). Mr. Strong is no longer owed the $54.00. Mr. Strong believes the incorrect documentation was purposeful, because "People don't make mistake[s]." (*Id.*, p. 63).

In addition to the foregoing evidence the summary judgment record contains the following evidence submitted by Brevard, which is not genuinely disputed. Mr. Charles Lyles states that he is Ms. Roach's supervisor. (Doc. 56, Attach. 4, Lyles Aff. ¶ 1). Shortly after Mr. Strong joined Brevard he was given the opportunity to perform the spotting task in addition to his shelf-stocking duties. (*Id.* ¶ 3). Because it appeared that spotting speed decreased during this period, Mr. Lyles told Ms. Roach he did not want Mr. Strong to spot on a regular basis. For management reasons Mr. Lyles needs to insure that the spotting task is performed by the fastest workers so merchandise can get onto the floor for stocking as efficiently as possible. Mr. Strong is not the only shelf stocker who is not routinely allowed to spot. The fact that Mr. Strong is disabled has nothing to do with him not spotting on a regular

basis.  (*Id*.).

It is generally Mr. Lyles' responsibility to assign the task of stripping and waxing the commissary floors.  (*Id*. ¶ 2).  Ordinarily, members of the custodial crew perform that task.  Mr. Strong is not, and has never been, on the custodial crew.  On one occasion when Mr. Lyles was shorthanded, he asked Mr. Strong if he wanted to assist, and Mr. Strong did so.  The next time the floors needed stripping and waxing, Mr. Lyles did not have a similar need for additional workers.  (*Id*).  He selected persons experienced in stripping and waxing the floors, namely,  members of the custodial crew and one James Harris who is a lead worker in the shelf stocking area. (*Id*.).  Mr. Harris is a sheltered worker, as are most of the custodial crew.  The fact that Mr. Strong is a sheltered/disabled worker played no part in Mr. Lyles' decision not to use him to strip and wax the floors.  (*Id*.).

In response to Mr. Strong expressing an interest in warehouse work, Mr. Lyles called him "at least a couple of times" when shorthanded, to see if Mr. Strong wanted to assist.  (*Id*. ¶ 4).  Mr. Strong did not respond to the telephone calls, so Mr. Lyles contacted others.

Generally, those who work in the warehouse on a daily basis are fork-lift certified.  Those who began warehouse work immediately upon joining Brevard did so because they were fork-lift certified.  Those who were moved into warehouse positions from other positions were spotters who were allowed to move only because they spotted at 100%, meaning they spotted very quickly with practically no errors.  Mr. Strong is not fork-lift certified and works as a shelf stocker, not a spotter. Therefore, he is not in a position to move into a warehouse position.  Mr. Lyles' decision not to give Mr. Strong warehouse training or move him into a warehouse position had nothing to do with Strong's disability or the fact that he is a sheltered worker.  (*Id*.).

Mr. Lyles does not recall Mr. Strong ever asking him to work the day shift.  (*Id*., ¶ 5).  Even if he had, Mr. Lyles' decision whether or not to use him would be based on whether Mr. Strong displayed excellent people skills, because day shift workers

come into contact with the public. In light of Mr. Strong's false report concerning Mr. Swift, Mr. Lyles questions Mr. Strong's people skills. Nonetheless, Mr. Strong has never asked for day shift work, and has never been denied such work on the basis of his disability. (*Id*.).

The hand drawing of a clock has existed for some time, indeed prior to Brevard being awarded the contract for the Corry Station commissary. (*Id*. ¶ 6). The clock has been provided to all workers to assist them in calculating their work minutes. It is intended to help them understand their work time. (*Id*.).

Ms. Roach reiterates in her affidavit that the drawing of the clock was provided to all workers to help them calculate their work time. (Doc. 56, Attach. 6, Roach Aff. ¶ 2). Ms. Roach does not recall Mr. Strong ever requesting to work on a day shift stocking shelves. (*Id*. ¶ 3). Although Mr. Strong was asked to stop regularly assisting with the spotting task in addition to his normal shelf-stocking duties, Ms. Roach has offered him the opportunity to spot on weekends. (*Id*. ¶ 4). The decision to have Mr. Strong stop performing spotting duties on a regular basis during the week was made by Mr. Lyles.

Mr. Carl Stephens is the Operations Manager for Brevard. (Doc. 56, Attach. 1, Stephens Aff. ¶ 1). On August 10, 2007, the human resources department at Brevard received a letter from Mr. Strong dated August 7, 2007. (*Id*. ¶ 3). Mr. Stephens investigated Mr. Strong's complaints, and memorialized his findings in a memorandum.

Brevard has submitted the following exhibits: a copy of Mr. Strong's August 7, 2007 letter (doc. 56, Attach. 1, Stephens Aff., Ex. A), a copy of Mr. Stephens' memorandum (*id*., Ex. B), a copy of the drawing of the clock (doc. 56, Attach. 3), a copy of Mr. Strong's shelf-stocking piece rate (*id*., Attach. 5), and a copy of the Brevard Worksite Handbook (*id*., Attach 7).

## Whether Brevard Is Entitled To Summary Judgment

Mr. Strong asserts three claims: disability discrimination based on tangible employment acts, disability discrimination based on a hostile work environment, and

retaliation.[5]  For purposes of its motion for summary judgment, Brevard assumes Mr. Strong is an "employee" under the ADA, (doc. 54, p. 5 n. 1), and does not contest that Mr. Strong meets the first two requirements of a *prima facie* case:  that he is disabled and that he qualifies for his position (doc. 54, p. 7).  Brevard contends Mr. Strong cannot satisfy the third element of a *prima facie* case – that he was subjected to unlawful discrimination because of his disability.

> i.      Disability Discrimination Based On Tangible Employment Actions

Mr. Strong asserts Brevard discriminated against him by denying him opportunities to perform tasks other than his normal shelf-stocking duties (spotting, stripping floors, working in the warehouse, and working the day shift).  Brevard contends it is entitled to summary judgment because other persons performing the spotting, warehousing, stripping floors and day shift tasks are also disabled; therefore, Mr. Strong cannot establish disability-based discrimination.  (Doc. 54, p. 2).

Mr. Strong may avoid summary judgment in one of two ways.  He may rely on the traditional framework and use direct evidence to create a triable issue on whether he was denied opportunities because of his disability.  Alternatively, Mr. Strong may use circumstantial evidence and rely on the *McDonnell Douglas* framework to create a triable issue.  *See McDonnell Douglas Corp., supra*.  Mr. Strong has done neither.

---

[5]Although causes of action exist under the ADA for improper medical inquiry and unlawful disclosure, *see* 42 U.S.C. § 12112(d)(4)(A) (2009) (restricting  an employer's ability to make medical inquiries of an employee into the nature of his disability, unless such inquiry is shown to be "job-related and consistent with business necessity."); 42 U.S.C. § 12112(d)(4)(C) (requiring an employer to keep confidential any information about an employee's medical condition or history gleaned from a permissible medical inquiry); 29 C.F.R. § 1630.14(c)(1), a liberal construction of Mr. Strong's complaint does not provide fair notice of a prohibited medical inquiry or unlawful disclosure claim. The complaint mentions Brevard inquiring into and requiring proof of Mr. Strong's disability only as part of the alleged "harassment" underlying Mr. Strong's hostile work environment claim.  (Doc. 56, Attach. 2, Strong Dep., p. 10).  Therefore the court does not read the complaint as asserting a separate claim arising under 42 U.S.C. § 12112(d)(4).  This is consistent with Mr. Strong's characterization of his claims at his deposition.  When counsel for Brevard clarified the nature of Mr. Strong's allegations concerning the inquiry into his disability, Mr. Strong characterized it as an incident of "harassment." (Doc. 56, Attach. 2, Strong Dep., p. 10).

Mr. Strong has not set forth any direct evidence of discriminatory motive concerning the denial of opportunities.  He admits that Ms. Roach's stated reason for not allowing him to spot was his substandard performance, and fails to provide any evidence whatsoever of what motivated Brevard's alleged denial of the remaining opportunities.  Although during spotting Ms. Roach called Mr. Strong "retarded" and "stupid" when he put things in the wrong place, it cannot be said that the intent of such remarks "could be nothing other than to discriminate," *Schoenfeld*, 168 F.3d at 1266; *see also Akouri v. Florida Dep't of Transp.*, 408 F.3d 1338, 1347 (11th Cir. 2005) ("If the alleged statement suggests, but does not prove, a discriminatory motive, then it is considered circumstantial evidence."); *Merritt*, 120 F.3d at 1189 ("Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence.").

Assuming, without deciding, that Mr. Strong's inference of discriminatory motive is sufficient to establish a *prima facie* case of discrimination, he has failed to create a triable issue under the *McDonnell Douglas* framework.  Brevard has submitted evidence that the reason Mr. Strong was not provided additional spotting opportunities was his performance – he was not as fast or productive as others. (Doc. 56, Attach. 4, Lyles Aff. and Attach. 6, Roach Aff.).  The reason Mr. Strong was not given additional opportunities to strip and wax the floors was because other, more experienced workers were available to do it.  (*Id*.).  The reason Mr. Strong was not allowed training opportunities in the warehouse was because he did not respond to Mr. Lyle's attempts to contact him when a temporary need arose, and the reason he was not moved permanently into a warehouse position was because he had not attained 100% proficiency as a spotter.  (*Id*.).  The reason Mr. Strong was not invited to work the day shift was because he had not made his desire known to Mr. Lyles, and in any event had not demonstrated the requisite people skills.  (*Id*.).  Mr. Strong has presented no evidence refuting Brevard's proffered legitimate, nondiscriminatory reasons.  Because Mr. Strong has failed to present evidence raising a genuine factual dispute for trial concerning whether Brevard's reasons

were pretextual, summary judgment on this aspect of his claim is appropriate.

With regard to Mr. Strong's discrimination claim based on Brevard changing its timekeeping system for sheltered shelf stockers from a timecard machine to a manual timekeeping system, Brevard asserts he has not shown this was an adverse employment action.  (Doc. 54, p. 2).  In order to establish an adverse employment action, the Eleventh Circuit requires an employee to establish an "ultimate employment decision" or "make some other showing of substantiality in the employment context." *Crawford*, 529 F.3d at 970 (citing cases).  This Circuit defines ultimate employment decisions as those "such as termination, failure to hire, or demotion." *Stavropoulos v. Firestone*, 361 F.3d 610, 617 (11th Cir. 2004).  Conduct falling short of an ultimate employment decision "must, in some substantial way, alter the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Crawford*, 529 F.3d at 970 (internal quotation marks omitted).  In the instant case, Mr. Strong does not present evidence sufficient to survive summary judgment that Brevard's change in its timekeeping system adversely affected him.[6] Although he expresses skepticism of Ms. Roach's stated reason for the change (emphasizing the hypocrisy in Ms. Roach's explanation that sheltered workers were "stealing time" when it was she, a non-sheltered employee, who was abusing the system), he has failed to establish the existence of any genuine factual issues for trial concerning whether the change in the timekeeping system adversely altered the terms, conditions or privileges of his employment.  Therefore, Brevard is entitled to summary judgment on this aspect of his claim.

ii.     Disability Discrimination Based On A Hostile Work Environment

Mr. Strong asserts a harassing or hostile work environment claim based on Brevard (*i.e.*, Ms. Roach and Ms. Seaman) inquiring into the nature of his disability,

---

[6]Mr. Strong concedes that the one time an error occurred in the reporting of his hours, it was corrected to his satisfaction.  (Doc. 56, Attach. 2, Strong Dep., p. ???).

Ms. Roach giving him a hand drawing of a clock, and Ms. Roach and Mr. Swift calling him "retarded" and "stupid." Brevard contends Mr. Strong has failed to establish *a prima facie* case of harassment because his allegations, even if true, do not describe conduct that is adverse, or if adverse, that rises to the level of severe or pervasive. (Doc. 54, p. 2).

"Workplace conduct is not measured in isolation. Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (citations and quotation marks omitted). As discussed previously, the plaintiff must prove that the environment was both subjectively and objectively hostile. *Harris*, 510 U.S. at 21-22, 114 S.Ct. 367. "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1246 (11th Cir. 1999) (quoting *Harris*, 510 U.S. at 21-22, 114 S.Ct. 367). "[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367). In evaluating allegedly discriminatory conduct, the court must consider its "frequency . . . ; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367, quoted in *Mendoza*, 195 F.3d at 1258 (Tjoflat, J., concurring in part, and dissenting in part).

The undisputed circumstances surrounding Brevard's inquiry into the nature of Mr. Strong's disability and requiring proof thereof, are these. Mr. Strong was aware of his special relationship with Brevard. He sought employment through Brevard because they hired people with disabilities, and he was accepted into Brevard's program based on a mutual understanding that he had disability. (Doc.

56, Attach. 2, Strong Dep., pp. 10, 19-21; *see also* Attach. 1, Stephens Aff. ¶ 2). A condition of Brevard's JWOD contract with the Corry Station commissary was that it provide persons with severe disabilities to perform the work. A condition of Mr. Strong's acceptance into Brevard's program to provide services to the commissary was that he qualify as a person with a disability under the JWOD Act. (Doc. 56, Attach. 1, Stephens Aff. ¶¶ 1, 2). In light of this evidence, a reasonable person could not perceive Brevard's inquiry into Mr. Strong's disability or Brevard's requirement that he obtain documentation verifying his disability, as hostile, abusive, or harassing.[7]

With regard to the drawing of a clock, Mr. Strong does not explain why he ws offended by the drawing, except to say that no one else was given the drawing until months later. But even accepting as true that Mr. Strong was subjectively offended, he has failed to provide evidence from which a reasonable jury could conclude that the drawing was objectively hostile. The evidence in the summary judgment record establishes that the drawing showed how an hour of time would be divided into decimal increments for purposes of Brevard's time records.[8] (Doc. 56, Attach. 3). It was provided to employees to assist them in recording their time.

As to the name-calling, Mr. Strong's evidence shows that shortly after Mr. Strong disclosed his slow learning disability to Ms. Roach, she and Mr. Swift called him "retarded" and "stupid" during a two-week period in 2006 when Mr. Strong, while still in the process of learning the spotting task and not yet familiar with the

---

[7]The sole evidence offered by Mr. Strong in support of his contention that this was objectively (or even subjectively) hostile is the fact that the Social Security Administration later told him his disability was confidential. But the court cannot consider that evidence, because it is inadmissible hearsay (*i.e.*, an out-of-court statement of a Social Security Administration employee offered to prove the truth of the matter asserted – that the inquiry was improper). *See Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 783 (11th Cir. 2004) (inadmissible hearsay generally cannot be considered on a summary judgment motion). Furthermore, it is doubtful that a plaintiff can meet the subjective element of a hostile work environment claim based solely on evidence that a third-party believed the conduct to be improper.

[8]For example, 1 hour and 45 minutes would be reflected as 1.75 hours.

layout of the commissary, put things in the wrong place. (Doc. 56, Attach. 2, Strong Dep., pp. 32-49). The name-calling did not extend beyond the two-week period or into any other aspect of Mr. Strong's work. Since then, Mr. Strong has spotted (on weekends) without any name-calling. (*Id.*, p. 49). Mr. Strong states the name-calling was "disturbing" and caused him to go home from work "feeling bad and upset,"(*id.*, p. 35), but does not indicate that it interfered with his work. From this evidence, even if a reasonable jury could infer that the name-calling was rooted in Mr. Strong's disability, there is insufficient evidence to create a genuine issue of material fact on the question whether the name calling, viewed objectively, was severe or pervasive enough to create a hostile work environment. The offensive utterance was not extremely serious, or physically intimidating or threatening to be deemed severe. Nor was it sufficiently continuous or concerted in order to be deemed pervasive. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998) (discussing the standards for judging hostility). *Compare Gupta*, 212 F.3d at 584-85 (assuming alleged comments by assistant professor's supervisor, including telling professor she was beautiful on one occasion, frequently calling her at home, and commenting on promiscuity of people from Jamaica as compared to the innocence of people from India, were of a gender-related or sexual nature, they were not sufficiently severe and pervasive to support hostile environment sexual harassment claim; calls were not intimidating or threatening, and did not contain sexually explicit remarks or innuendos, and other comments were isolated utterances over a period of several months),[9] *abrogated on other grounds by*

---

[9]In *Gupta*, the plaintiff's supervisor (1) looked her up and down on one occasion; (2) told her, "If you need anything, just come talk to me"; (3) called her at home at night several times each week and asked, "Are you talking to your boyfriend? Where is your boyfriend?"; (4) called her at home at night and asked her if she was in bed; (5) stared at her legs on one occasion when she wore a short skirt; (6) put his hand partly on the inside of her right thigh on one occasion; (7) lifted the hem of her dress four inches with his hand; and (8) told her twice, "Indian people are really decent, and the Caribbean and Western people are really promiscuous. I can look at you and I can tell you are innocent and you don't have much experience." *Id.* at 578- 79. This conduct was found insufficient to constitute sexual harassment.

*Crawford v. Carroll*, *supra*; *with Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1147-48 (11th Cir. 2008) (reversing grant of summary judgment, concluding that although the offensive sex-specific language was not "severe" under Title VII, its daily use for nearly three years presented a factual question of whether pervasiveness was established); *see also Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009) (holding that male supervisor's occasional statements to female subordinate did not create actionable hostile work environment; supervisor stated that he and female employee should be "sweet" to each other and that he loved her approximately six times over the course of about one month (meaning that she was allegedly subject to one subjectively offensive utterance by supervisor every few days), and statements were not severe, physically threatening, or humiliating, were at most unwanted and offensive, and were not the kind of conduct that would interfere unreasonably with a reasonable person's work performance or destroy her opportunity to succeed in the workplace); *Jensen v. Potter*, 435 F.3d 444, 451(3rd Cir.) ("[o]ccasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment"), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Vasquez-Ortiz v. PHC Partners, Inc.*, No. 8:04cv1570, 2005 WL 3477553 (M.D. Fla. Dec. 19, 2005) (granting summary judgment on disability harassment claim, concluding that evidence that a vice president called the plaintiff a "cripple" or "handicap girl" or "drunk" about three times weekly for six months, and leaned toward her when she walked the halls to cause her to hit the wall, was offensive but not so objectively severe and pervasive that it affected a term, condition, or privilege of her employment).

In short, all of the alleged incidents, taken together and viewed in the light most favorable to Mr. Strong, fail to establish that the workplace at Brevard could be objectively perceived as permeated with discriminatory intimidation, ridicule, and insult such that the nature of Mr. Strong's employment was changed. Because there

is no genuine issue of material fact for trial on whether the inquiry into Mr. Strong's disability, the name-calling and the drawing of the clock could be said to have created "an environment that a reasonable person would find hostile or abusive," *Oncale*, 523 U.S. at 81, 118 S.Ct. 998, summary judgment is appropriate.[10]

    iv.   <u>Retaliation</u>

Mr. Strong claims that after he reported the particular acts of discrimination to management, his supervisor(s) retaliated against him by inaccurately reporting his hours.[11]  Brevard contends it is entitled to summary judgment on this claim, because plaintiff fails to establish a *prima facie* case of retaliation.  Specifically, he fails to establish that he was subjected to an adverse employment action and further fails to establish a causal connection between his protected activity and any action by Brevard.  (Doc. 54, p. 2).

Mr. Strong has provided no direct evidence of retaliation.  He asserts in his complaint that a retaliatory motive can be inferred from the fact that the discrepancies in documenting his hours occurred after he complained to Mr. Stephens of the alleged discrimination and harassment. (Doc. 1, pp. 4-5).  But even assuming for the sake of argument that plaintiff established a *prima facie* case, Brevard has stated a legitimate, non-retaliatory reason for the discrepancy in documentation – human error.  This reason is supported with additional evidence

---

[10]The alleged comment of Mr. Lyles that Mr. Strong "must be stupid" to think that he (Lyles) would attempt to protect Mr. Swift by allowing him to bring a concealed weapon onto the base and then warn Swift that the military police were on to him, cannot be construed as harassment based on a disability, even if the conversation occurred as Mr. Strong describes.

Further, although plaintiff alleged in his complaint that he was called a "retarded snitch," he clarified in his deposition that he was called a "snitch" and "the police" for having made the false report to the military police about Mr. Swift and for having informed management of Ms. Roach's abuse of the timecard machine.  (Doc. 56, Attach. 2, Strong Dep., p. 64).

[11]Again, although plaintiff alleges he was called a "retarded snitch," he does not assert that this was in retaliation for reporting the alleged disability discrimination.  Rather, he says this name-calling was in connection with his false report that Mr. Swift was carrying a gun, and his report to management that Ms. Roach was clocking in Mr. Swift even though he was not at work.  (Doc. 56, Attach. 2, Strong Dep., p. 64).

that the error was corrected promptly to Mr. Strong's satisfaction upon Mr. Strong brining it to his supervisors' attention. Mr. Strong does not present evidence creating a genuine issue of fact for trial that Brevard's reason for the inaccuracy was pretextual. His unsupported statement that "people don't make mistakes," is insufficient.[12] Accordingly, Brevard is entitled to summary judgment on Mr. Strong's retaliation claim.

## CONCLUSION

The summary judgment record establishes that there are no genuine issues of material fact for trial and that Brevard is entitled to judgment as a matter of law on all of Mr. Strong's claims.

## SANCTIONS FOR MR. STRONG'S FAILURE TO APPEAR AT HIS DEPOSITION

Also pending is the matter of sanctions for Mr. Strong's failure to appear at his deposition. On July 29, 2009, after Mr. Strong failed to appear at his deposition scheduled for that day, Brevard filed a "Motion for Sanctions and for Dismissal for Plaintiff's Failure to Appear for Plaintiff's Deposition and Failure to Comply with the Court's Discovery Orders." (Doc. 41). Mr. Strong responded in opposition to the motion. (Doc. 48). On September 14, 2009, the court granted Brevard's motion, finding that Mr. Strong failed to attend his deposition after being served with proper notice, and that his failure to attend was unjustified. The court directed Brevard to file, on or before September 25, 2009, documentation in support of the amount of sanctions. (Doc. 50). Mr. Strong was afforded until October 2, 2009 to object to the amount requested. (*Id*.). Thereafter, Brevard timely filed a "Verified Statement of Expenses," (doc. 51), to which Mr. Strong did not object. Brevard seeks a total of

---

[12]Mr. Strong's allegation that he was called a "snitch" and "the police" cannot support his retaliation claim, because he admits that those statements were made in response to his false report that Mr. Swift was carrying a gun and his report that Ms. Roach was allegedly abusing the timecard machine. His allegations do not remotely suggest that the name-calling related to his reporting the alleged disability discrimination.

$3,217.50 in sanctions, which includes attorney's fees for file review, deposition preparation, appearing at the failed deposition, communicating with Mr. Strong concerning his missed deposition, preparing the motion for sanctions, and responding to Mr. Strong's response to the motion. It also includes the court reporter's fee for appearance. (Doc. 51).

Sanctions pursuant to Federal Rule of Civil Procedure 37(d) are mandatory and should be imposed by this court "unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust."[13] The Rule places an obligation on the court to impose sanctions unless there is an affirmative reason for not doing so. *See* 8 C. Wright and J. Miller, Federal Practice and Procedure § 2291 at 820 (1970).

In making an award in this case, the court is aware of Mr. Strong's disability, his *pro se* status and his indigence. But a flat *per se* policy against the imposition of sanctions under Federal Civil Rule 37 upon a *pro se* party who is financially indigent does not accord with the purposes of that rule and would open the door to many possible abuses. Further, the court is mindful of the particular circumstances involved in this case. In addition to the fact that Mr. Strong's failure to appear for his deposition was totally unjustified, it represented his second blatant refusal to discharge his discovery obligations in this case. As outlined in the court's September 14, 2009 order, earlier in the case Mr. Strong had wholly failed to respond to Brevard's interrogatories and requests for production of documents. A hearing

---

[13]Rule 37(d) of the Federal Rules of Civil Procedure provides in pertinent part:

Failure of Party to Attend at Own Deposition or Serve Answers to Interrogatories or Respond to Request for Inspection. If a party . . . fails . . . to appear before the officer who is to take his deposition after being served with a proper notice . . ., the court in which the action is pending on motion may make such orders in regard to the failure as are just. . . . In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising him or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

on the matter was held on June 12, 2009. (Doc. 38). The court explained to Mr. Strong his discovery obligations and admonished him that his failure to cooperate in discovery could result in a number of sanctions, including monetary sanctions and dismissal of his case. Mr. Strong agreed to accompany Brevard's counsel to the latter's office to provide all relevant information and documents in his possession. On a balancing basis and in the spirit of giving Mr. Strong another chance, this court did not impose sanctions, as Brevard requested, in connection with that instance. (Doc. 39). A mere six weeks later, Mr. Strong abused this second chance by unjustifiably failing to appear at his deposition.

It is reasonable to award some kind of monetary sanction for the effort wasted as a direct result of Mr. Strong's failure to appear. This includes a reasonable amount for counsel's time for appearing at the failed deposition and preparing the motion for sanctions, as well as the cost of the certificate of non-appearance, for a total award of $555.00.

Accordingly, it is ORDERED:

Mr. Strong shall pay to Brevard's counsel the sum of $555.00 in connection with the July 29, 2009 deposition for which Mr. Strong failed to appear.

And it is respectfully RECOMMENDED:

1. That Brevard's motion for summary judgment (doc. 54) be GRANTED.

2. That the clerk be directed to enter judgment in favor of Brevard, and close this file.

At Pensacola, Florida this 29th day of March, 2010.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).**